IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**HOLLY HAYES, Administratrix of the**
**Estate of Hollis Bealer, Deceased**                                **PLAINTIFF**

v.                       Case No. 4:18-cv-00816 KGB

**UNITED STATES OF AMERICA**                                      **DEFENDANT**

## OPINION AND ORDER

Before the Court is a motion for summary judgment filed by defendant the United States of America ("the United States") (Dkt. No. 11). Plaintiff Holly Hayes, as the Administratrix for the Estate of Hollis Bealer ("Ms. Hayes"), has responded to the motion (Dkt. No. 15), and the United States has filed a reply (Dkt. No. 18). For the following reasons, the Court grants the United States' motion for summary judgment (Dkt. No. 11).

    **I.**     **Factual Background**

On November 11, 2018, Ms. Hayes initiated this federal tort action against the United States for medical negligence on behalf of the Estate of Hollis Bealer pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and the Arkansas Medical Malpractice Act ("AMMA"), Arkansas Code Annotated § 16-114-201, *et seq.* (Dkt. No. 1). Ms. Hayes also brings a wrongful death action on behalf of the statutory beneficiaries pursuant to the Arkansas Wrongful Death Act ("AWDA"), Arkansas Code Annotated § 16-62-102 (*Id.*). Ms. Hayes alleges that the nurses at the Central Arkansas Veterans Healthcare System ("CAVHS") deviated from the standard of care by allowing Mr. Bealer to fall on November 21, 2015, and that, as a result, Mr. Bealer sustained physical pain and suffering of a chin laceration, a right humerus fracture, and death (*Id.*).

Mr. Bealer was an 80-year-old gentleman with multiple comorbidities in November 2015, including: status post total thyroidectomy; status post laryngectomy for supraglottic squamous cell carcinoma; nicotine addiction; hyperlipidemia; benign prostatic hyperplasia; and hypothyroidism (Dkt. No. 13, ¶ 1). Mr. Bealer had an extensive medical history leading to and stemming from these various comorbidities (*Id.*, ¶¶ 2-7). Mr. Bealer was admitted in July 2013 following acute kidney failure as a result of acute urinary retention (*Id.*, ¶ 8). No mention of any neck pain was made during his inpatient stay (*Id.*). Mr. Bealer was hospitalized in May 2015 with bilateral pneumonia and a possible urinary tract infection, and a CT scan of his chest was performed at that time which revealed no malignancy (*Id.*, ¶ 9). He recovered well and was discharged home (*Id.*). His post-hospital follow-up in the primary care provider clinic on June 6, 2015, was unremarkable, and he did not mention any active complaints (*Id.*).

On July 16, 2015, Mr. Bealer presented to the emergency room with neck pain with two days' history of sore throat, sinus drainage, and left ear pain (*Id.*, ¶ 10). He was treated for rhinitis (*Id.*). On August 15, 2015, Mr. Bealer presented to the emergency room at the John L. McClellan Memorial Veterans Hospital ("VA Hospital") with right ear pain and swelling (*Id.*, ¶ 11). A physical examination revealed a small furuncle with induration, and faint redness without any clinical indication for drainage was noted (*Id.*). Mr. Bealer was prescribed oral antibiotics (*Id.*). On August 21, 2015, Mr. Bealer presented to the emergency room with urinary retention (*Id.*, ¶ 12). A Foley catheter was placed, and more than 700 milliliters of urine was drained immediately (*Id.*). There was no mention of any continued symptoms of sore throat or ear pain during that visit or on August 28, 2015, during his ophthalmology clinic visit according to the medical records (*Id.*). On September 18, 2015, Mr. Bealer presented to the emergency room asking for mouthwash for his sore throat (*Id.*, ¶ 13). A physical exam revealed oral thrush, and medication for treatment

of thrush was prescribed (*Id.*). In the later part of October 2015, Mr. Bealer had a routine follow-up visit with his primary care provider and complained of right neck pain and a seven-pound weight loss within the previous four months (*Id.*, ¶ 14). His physical examination did not reveal any neck mass (*Id.*). On November 4, 2015, Mr. Bealer presented to the emergency room with a right neck pain and right earache for three weeks (*Id.*, ¶ 15). He reported worsening of the pain upon lying in right lateral position (*Id.*). The physical examination was unremarkable per the emergency room physician, though he did make a note that if the symptoms continued further imaging studies would be warranted to evaluate for possible new malignancy (*Id.*).

On November 20, 2015, Mr. Bealer was brought to the VA Hospital emergency room by his daughter with a four-day history of productive cough, right neck pain, nausea, vomiting, and headache (*Id.*, ¶¶ 16, 61). The family notified the health care providers that Mr. Bealer had been recently declining in cognitive function (*Id.*, ¶ 16). A CT of the soft tissue of the neck with intravenous contrast was ordered to rule out a new head and neck malignancy (*Id.*, ¶ 17). The CT was performed on November 20, 2015, at 6:30 p.m. and revealed a seven-centimeter mass at the C1 level of the head and neck (*Id.*, ¶ 18). It was suspicious for recurrent malignant disease (*Id.*). A CT of the chest was performed on November 20, 2015, at 6:58 p.m. and showed patchy right lower lobe pneumonia, and a three-millimeter non-calcified pulmonary nodule in the left upper lobe was also seen (*Id.*, ¶ 19). On November 21, 2015, at 3:30 a.m., the hospitalist physician was notified that Mr. Bealer had fallen from the bed while trying to go to the restroom to void (*Id.*, ¶ 20). According to the physician's note, it was reported that Mr. Bealer hit his head and lower end of his jaw (*Id.*, ¶ 21). A superficial laceration of the chin area was noted and bandaged (*Id.*). No other obvious injuries were noted (*Id.*). A CT of the head and maxillofacial region was requested and performed on November 21, 2015, at 3:38 a.m. (*Id.*, ¶ 22). The CT of the head did not show

any fractures or intracranial hemorrhage (*Id.*). The CT of the maxillofacial region did not show any traumatic injury (*Id.*). An x-ray of the right tibia and fibula was performed on November 21, 2015, at 7:09 p.m. and was negative for injury (*Id.*, ¶ 23). The United States asserts that there was no mention of right shoulder pain immediately after the fall or in the several hours following the initial injury by any of the healthcare providers in the medical record (*Id.*, ¶ 24). Ms. Hayes contends that this claim is misleading as Mr. Bealer was only minimally able to communicate at the time (Dkt. No. 16, ¶ 2).

On November 22, 2015, a right shoulder x-ray was performed because Mr. Bealer began to complain of right shoulder pain (Dkt. No. 13, ¶ 25). The x-ray showed an abnormal sclerotic density in the surgical neck of the humerus and slight inferior location of the humeral head was identified (*Id.*). An orthopedic consult was obtained on November 23, 2015 (*Id.*, ¶ 26). The orthopedic consult note mentions that Mr. Bealer was not using his right upper extremity as much as a left upper extremity (*Id.*). However, when providers asked whether Mr. Bealer had any right shoulder pain, he did not answer (*Id.*). A physical exam of the shoulder showed no pain on palpation, and, as stated by the physician, "the patient [did] not grimace to palpation or with range of motion of the right shoulder" (*Id.*, ¶ 27). A right upper extremity sling was recommended along with a two-week follow-up in the orthopedic clinic (*Id.*). No surgical intervention was indicated based on the nature of the possible injury and likelihood of complete healing (*Id.*). Mr. Bealer's medical history includes an April 27, 2009, shoulder x-ray that showed an irregularity of the surgical neck of the humerus with callus formation consistent with healed fracture (*Id.*, ¶ 28). This x-ray was taken a few months following a reported motor vehicle accident in February 2009 (*Id.*). In addition, Mr. Bealer's medical history includes a November 12, 2010, right shoulder x-ray,

which showed some impaction and some callus formation at the previous femoral neck fracture (*Id.*, ¶ 29).

An oncology consult was obtained on November 23, 2015, and Mr. Bealer's daughter reported 20-pound weight loss in the previous three months (*Id.*, ¶ 30). An oncology consult was obtained, and the oncologist's impression was that the tumor was a second primary malignancy, because it was identified 12 years after the initial diagnosis of squamous cell carcinoma of the larynx (*Id.*, ¶ 31). Mr. Bealer was deemed not to be a suitable candidate for treatment due to the extent of tumor involvement, advanced age, poor nutritional status, and poor performance status (*Id.*, ¶ 32). Palliative care and inpatient hospice care were recommended (*Id.*, ¶ 33). He was subsequently transferred to inpatient hospice care team for symptom management (*Id.*). Mr. Bealer was found to have a new right-sided head and neck malignancy 12 years after his diagnosis of squamous cell carcinoma of the larynx which was appropriately treated and was deemed cured after five years of no disease recurrence (*Id.*, ¶ 34).

The differential diagnosis of malignancy in this region following the treatment of head and neck carcinoma in the past includes a new head and neck carcinoma due to field cancerization effect induced by smoking (*Id.*, ¶ 35). Smoke-induced field cancerization is a known etiological factor to induce new malignancy in the head and neck region, esophagus, and lung (*Id.*, ¶ 36). Other differential diagnoses include aggressive lymphomas and radiation-induced pleomorphic sarcoma (*Id.*, ¶ 37). Radiation-induced pleomorphic sarcomas are aggressive soft tissue malignancies arising in the soft tissue structures of the previously radiated regions (*Id.*, ¶ 38). Radiation induced pleomorphic sarcoma is a very likely diagnosis based on the short duration of the development of true symptoms related to the malignancy, a few weeks as mentioned in the medical record (*Id.*, ¶ 38). The tumor extended from the region of prior radiation and surgical

intervention extending superiorly to intracranial region (*Id.*). This disease generally manifests infiltrative rapid growth (*Id.*). Radiation-induced pleomorphic sarcoma is high in this case, particularly in the setting of typical onset of the second malignancy 12 years after the radiation therapy arising at the previously radiated site and aggressive infiltration and destruction of the tumor at the involved spine and middle and posterior cranial fossae and short duration of symptoms (*Id.*, ¶ 39). In appropriately selected patients, these sarcomas are treated with preoperative combination chemotherapy followed by surgical resection (*Id.*, ¶ 40). Patients who are not suitable surgical candidates are treated with combination systemic chemotherapy to improve the progression free survival (*Id.*). Prognosis generally is dismal (*Id.*).

The chemotherapeutic agents used for sarcomas are highly toxic (*Id.*, ¶ 41). Hence, the risk of toxicity and severe treatment related illness would have clearly outweighed the potential benefit for Mr. Bealer (*Id.*). Squamous cell carcinoma of the head and neck region are generally slow growing malignancies with symptoms spanning over a few months before the diagnosis is made due to the insidious nature of the malignancy and location (*Id.*, ¶ 42). Such malignancy with extensive involvement of the cervical region and intracranial extension is an incurable disease (*Id.*). In a patient appropriate for treatment, only palliative chemotherapy could have been instituted to improve the progression free survival (*Id.*, ¶ 43). However, the response to systemic chemotherapy is modest (*Id.*, ¶ 44). In a patient with poor performance and poor nutritional status, the risk of toxicity of systemic chemotherapy would have far outweighed the benefit of treatment (*Id.*). Palliative care would have been recommended in Mr. Bealer's case (*Id.*). Aggressive non-Hodgkin's lymphoma is a less likely differential diagnosis, and it is treated with combination systemic chemotherapy (*Id.*, ¶ 45). Mr. Bealer would not have been a candidate for treatment since the risk of toxicities with combination chemotherapy and death outweighed the benefit (*Id.*).

6

According to his daughter, Mr. Bealer had cognitive decline in the recent past (*Id.*, ¶ 46). His mental status declined rapidly during his hospitalization which does raise the possibility of involvement of the meninges with the malignancy, possible leptomeningeal, and extension of malignancy in the spinal fluid (*Id.*). The likely cause of Mr. Bealer's death was head and neck malignancy with intracranial extension of the disease resulting in cognitive decline and possible leptomeningeal spinal fluid involvement raising the intracranial pressure (*Id.*, ¶ 47).

The United States asserts that Mr. Bealer did not mention right shoulder pain immediately after his November 21, 2015 fall, that he did not verbalize whether he hit his right shoulder during the fall, and that he only mentioned soon after that fall that he hit his head and jaw (*Id.*, ¶ 48). Ms. Hayes challenges this assertion as misleading, claims that Mr. Bealer was only minimally able to communicate at the time, and notes that Mr. Bealer was suffering from a rapid decline in mental status (Dkt. No. 16, ¶ 2). The United States claims that the November 22, 2015, right shoulder x-ray did show sclerotic changes at the surgical neck of the humerus but that, in the absence of pain upon palpation and range of movement per the orthopedic resident's note, a new fracture of the neck and of the humerus is less likely, particularly in light of the fact that the previous x-rays in 2009 and 2010 revealed a healed impacted right humerus neck fracture (Dkt. No. 13, ¶ 49). The United States claims that the sclerotic changes and slightly inferior location of the humeral head were likely due to the previous fracture in 2009 followed by healing with healing bone impaction as was evident on the right shoulder x-ray in 2010 (*Id.*, ¶ 50). Additionally, the United States claims that the cervical tumor could have been the cause of any right shoulder pain and that the extensive involvement of the cervical vital structures by the tumor is clear as mentioned in the above-mentioned CT soft tissue neck examination (*Id.*, ¶ 51). Further, the United States claims that the cervical nerve dermatome C3 and C4 provide the sensory coverage to the shoulder region

7

(*Id.*, ¶ 52). Due to the extent of the tumor described, referred pain because of cervical nerve root C3 and C4 involvement by the tumor or involvement anywhere in the path to the skin could result in referred shoulder pain without any structural injury to the shoulder or surrounding structure (*Id.*). Ms. Hayes disputes these claims and maintains that the proof in the record does not support them (Dkt. No. 16, ¶ 3).

Mr. Bealer was transferred to palliative care service after the malignancy and was diagnosed and deemed untreatable and terminal (Dkt. No. 13, ¶ 53). It was not the right humerus abnormality or any head, jaw, or chin injury that led to the transfer of Mr. Bealer to the inpatient palliative care team (*Id.*, ¶ 54). The United States claims that Mr. Bealer's right humerus fracture would not have triggered the events that caused Mr. Bealer's death on December 5, 2015, but Ms. Hayes disputes that claim and asserts that it is contradicted by the findings on Mr. Bealer's death certificate[1] (Dkt. Nos. 13, ¶ 55; 16, ¶ 4). The location and nature of such a right shoulder injury does not result in marked blood loss, multi-organ failure, or death (Dkt. No. 13, ¶ 56). Mr. Bealer's head, jaw, or chin injury as a result of the fall did not cause his death on December 5, 2015 (*Id.*, ¶ 57). The United States claims that Mr. Bealer died of the head and neck cancer rather than the fall of November 21, 2015, and Ms. Hayes disputes that claim and maintains that the proof suggests the fall and shoulder injury were factors in Mr. Bealer's death based on the findings of the death certificate (Dkt. Nos. 13, ¶ 58; 16, ¶ 5).

Dr. John Gocio of the CAVHS had an "institutional disclosure"—an official CAVHS communication of an adverse event—regarding the November 21, 2015, fall with Mr. Bealer's family on November 24, 2015 (Dkt. No. 13, ¶ 63). Ms. Hayes completed a Standard Form 95 claim for damage, injury, or death on December 1, 2017, and mailed her form via the United States

---

[1] Ms. Hayes has submitted a copy of Mr. Bealer's death certificate (Dkt. No. 16-1).

Postal Service ("USPS") the following day (Dkt. No. 13-2, at 3-4, 10-11). The Department of Veterans Affairs ("VA") time stamped Ms. Hayes' administrative claim for medical negligence on behalf of Mr. Bealer as received on December 7, 2017 (Dkt. Nos. 13, ¶ 59; 13-2, at 3). Ms. Hayes' USPS tracking documentation shows that the administrative claim was "delivered to mail room" of a VA location in Jackson, Mississippi, on December 5, 2017 (Dkt. Nos. 13, ¶ 60; 13-2, at 10-13). The VA's Office of the General Counsel denied Ms. Hayes' administrative claim on May 29, 2018 (Dkt. Nos. 13, ¶ 62; 13-2, at 15).

## II. Legal Standard

Summary judgment is proper if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar

9

summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III. Analysis

The United States moves for summary judgment on the following grounds: (1) Ms. Hayes has no medical expert proof on cause of death as required under Arkansas law; (2) the beneficiaries' wrongful death action is derivative of the underlying tort; (3) the testimony of Atif Khan, M.D., a hematology oncologist practicing in Batesville, Arkansas, establishes that Mr. Bealer died of head and neck cancer rather than as a result of his fall; and (4) the medical negligence claim is time-barred (Dkt. No. 11, ¶¶ 4-9). In response, Ms. Hayes argues the following: (1) the United States' motion should be denied as untimely; (2) there is adequate proof of causation and causation is usually a jury question; (3) Dr. Khan's opinion on cause of death does not address or contradict the death certificate; and (4) the "discovery rule" renders her medical negligence claim timely (Dkt. No. 15, ¶¶ 1-5).

10

### A. Timeliness Of Motion

Ms. Hayes argues that this motion should be denied as untimely (Dkt. No. 17, at 1-2). The Court notes that the Final Scheduling Order set December 12, 2019, as the motions deadline (Dkt. No. 8). The United States moved for summary judgment on December 20, 2019, eight days past the deadline (Dkt. No. 11). Ms. Hayes does not state any prejudice that she suffered due to the filing of this motion, and she communicated to the Court that she anticipated the filing of a dispositive motion in her status report filed on December 12, 2019 (Dkt. No. 10, ¶ 4). The United States asserts that it miscalculated the deadline to file a motion for summary judgment as December 27, 2019 (Dkt. No. 18, at 4). The Court accepts the United States' motion for summary judgment as timely filed "even though it was filed [eight] days after the deadline for dispositive motions set by the Court's scheduling order" because "the tardy filing did not prejudice [Ms. Hayes] under the circumstances, [the United States] had told [Ms. Hayes] they intended to file the motion, and there was no evidence defendants' untimely filing was in bad faith." *Rustan v. Rasmussen*, 208 F.3d 218 (8th Cir. 2000) (citing *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604-06 (10th Cir. 1997)) (unpublished).

### B. Survival Action—Physical Pain And Suffering

The Arkansas Survival Statute allows a cause of action to survive the death of the injured and be prosecuted on behalf of the estate after his death. Ark. Code Ann. § 16-62-101. That statute provides, in pertinent part, that:

> (a)(1) For wrongs done to the person or property of another, an action may be maintained against a wrongdoer, and the action may be brought by the person injured or, after his or her death, by his or her executor or administrator against the wrongdoer or, after the death of the wrongdoer, against the executor or administrator of the wrongdoer, in the same manner and with like effect in all respects as actions founded on contracts.
>
> . . .

11

> (b) In addition to all other elements of damages provided by law, a decedent's estate may recover for the decedent's loss of life as an independent element of damages.

Ark. Code. Ann. §§ 16-62-101(a)(1), (b).

Federal law bars tort claims against the United States unless they are presented in writing to the appropriate federal agency within two years after such claim accrues. 28 U.S.C. § 2401(b). The point in time at which a claim "accrues" under the FTCA is a matter of federal law. *See Brazzell v. United States*, 788 F.2d 1352, 1355 (8th Cir. 1986) (citing *Snyder v. United States*, 717 F.2d 1193, 1195 (8th Cir. 1983)); *Slaaten v. United States*, 990 F.2d 1038, 1041 (8th Cir. 1993). In actions for medical injury under the FTCA, a claim accrues when a plaintiff becomes aware of the injury and its probable cause. *See United States v. Kubrick*, 444 U.S. 111, 120 (1979); *Garza v. U.S. Bureau of Prisons*, 284 F.3d 930, 934 (8th Cir. 2002); *Osborn v. United States*, 918 F.2d 724, 731 (8th Cir. 1990). The Eighth Circuit recognizes an exception for medical malpractice cases, including medical malpractice cases under the FTCA, in which the injury and cause are not immediately known called the "discovery rule." *Osborn*, 918 F.2d at 731 (citing *Brazzell*, 788 F.2d at 1355-56; *Wollman v. Gross*, 637 F.2d 544, 547 (8th Cir. 1980), *cert denied*, 454 U.S. 893 (1981)). Under the "discovery rule," the claim "accrues when the plaintiff discovers[] or should have discovered the cause of injury." *Id.* (citing *Brazzell*, 788 F.2d at 1355-56). If the plaintiff fails to take action despite possessing knowledge of harm and its cause, a defendant is entitled to the limitations defense. *See K.E.S. v. United States*, 38 F.3d 1027, 1029 (8th Cir. 1994) (citing *Kubrick*, 444 U.S. at 123-24). That fact holds true "even if plaintiff does not know that the injury is legally redressable." *Id.* (citing *Kubrick*, 444 U.S. at 123-24).

The United States argues that Ms. Hayes' claim for physical pain and suffering as a result of Mr. Bealer's fall is time-barred (Dkt. No. 12, at 16-18). Though Ms. Hayes does not directly

respond to this allegation, Ms. Hayes argues that the claims in this action were timely filed within two years of the discovery date of Mr. Bealer's death on December 8, 2015 (Dkt. No. 17, at 6-7). Without citing any legal support, Ms. Hayes also asserts that the United States should be barred by laches from claiming that the administrative tort claim was untimely where the VA failed to raise that defense in its initial denial of the administrative tort claim (Dkt. Nos. 13-2, at 15; 17, at 7). The United States replies that the record evidence shows Mr. Bealer's injury was discovered, at the latest, during the institutional disclosure on November 24, 2015, leaving the two-year limitations period to expire on November 24, 2017, and rendering Ms. Hayes' action outside the statute of limitations (Dkt. No. 18, at 3-4).

Under Arkansas law, a plaintiff who brings an action under the AMMA may recover an amount for the pain and suffering and mental anguish of the deceased resulting from alleged malpractice. *See* Ark. Code Ann. § 16-114-208(a)(2). These types of damages cover only conscious pain and suffering of the deceased; they do not apply to allegations of unconsciousness or death. *See McMullin v. United States*, 515 F. Supp. 2d 914, 919 (E.D. Ark. 2007) (examining claim for conscious pain and suffering); *Dugal v. Commercial Standard Ins. Co.*, 456 F. Supp. 290, 292 (W.D. Ark. 1978) (same). However, the AMMA also provides for recovery, in the event the alleged medical negligence causes death. *See* Ark. Code Ann. §§ 16-114-201(1), (3); 16-114-202; *see also Ruffins v. ER Arkansas, P.A.*, 853 S.W.2d 877, 879 (Ark. 1993) (concluding that AMMA applies to all causes of action based upon medical negligence including wrongful death actions).

The record evidence demonstrates the following facts: (1) Mr. Bealer fell on November 21, 2015, and sustained a laceration to the chin and an alleged right shoulder injury; (2) Mr. Bealer's right humerus fracture was discovered on November 22, 2015; and (3) on November 24,

2015, Dr. Gocio had an institutional disclosure with Mr. Bealer's family that communicated Mr. Bealer's fall and resulting injuries to them (Dkt. Nos. 13, ¶¶ 20-27, 63; 20, at 128). Accordingly, Ms. Hayes, on behalf of the estate, had up to and including November 24, 2017, upon which to submit her administrative claim.[2] However, Ms. Hayes did not submit her claim until December 2017 (Dkt. Nos. 13, ¶¶ 59-60; 13-2). Ms. Hayes did not present an administrative claim within the two-year time limit as required; therefore, her claims under the FTCA as prosecuted in substance under the AMMA are time-barred. *See* 28 U.S.C. § 2401(b). This Court rejects any argument that, on the undisputed record evidence even construing all inferences in favor of Ms. Hayes, the continuous treatment doctrine or the tolling doctrine apply to alter the limitations period. Accordingly, the Court grants summary judgment in favor of the United States on Ms. Hayes' physical pain and suffering claims.

      **C.**     **Survival Action—Loss Of Life Claim**

For actions brought under the FTCA, courts must apply the law of the state in which the acts complained of occurred. *Goodman v. United States*, 2 F.3d 291, 292 (8th Cir. 1993). Under Arkansas Law, a plaintiff bringing an action for medical injury must prove the applicable standard of care and deviation therefrom, unless the asserted negligence is a matter of common knowledge. *See* Ark. Code Ann. § 16-114-206(a)(1)-(2); *Broussard v. St. Edward Mercy Health Sys., Inc.*, 386 S.W.3d 385, 388-89 (Ark. 2012). Moreover, "[i]n any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge," Arkansas law requires a plaintiff to prove "[b]y means of expert testimony provided only by a

---

[2] The United States does not concede that November 24, 2015, is definitively the appropriate accrual date (Dkt. No. 12, at 17). However, since November 24, 2015, is the latest possible date upon which these pain and suffering claims accrued and the Court is required to construe all record evidence in favor of Ms. Hayes, the Court uses that date at this stage of the proceedings.

14

qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred." Ark. Code Ann. § 16-114-206(a)(3). The Supreme Court of Arkansas has clarified this expert testimony requirement in the following manner:

> We have held that the proof required to survive a motion for summary judgment in a medical malpractice case must be in the form of expert testimony. *Oglesby v. Baptist Medical System,* 319 Ark. 280, 891 S.W.2d 48 (1995). It is simply not enough for an expert to opine that there was negligence which was the proximate cause of the alleged damages. *Aetna Casualty & Surety Co. v. Pilcher,* 244 Ark. 11, 424 S.W.2d 181 (1968). The opinion must be stated within a reasonable degree of medical certainty or probability. *Montgomery v. Butler,* 309 Ark. 491, 834 S.W.2d 148 (1992).

*Ford v. St. Paul Fire & Marine Ins. Co.*, 5 S.W.3d 460, 463 (Ark. 1999). Finally, the medical malpractice statute "implements the traditional tort standard of requiring proof that 'but for' the tortfeasor's negligence, the plaintiff's injury or death would not have occurred." *Id.* at 462-63.

The United States argues that Ms. Hayes' sole expert, Stacy Harris, R.N., CLNC, has specifically testified that she is not qualified to render a medical opinion on the cause of Mr. Bealer's death (Dkt. No. 12, at 10). Since Ms. Hayes presents no other experts, the United States claims that Ms. Hayes fails to establish that, but for the fall, Mr. Bealer's death would not have otherwise occurred (*Id.*, at 10-11). Consequently, the United States claims that Ms. Hayes' proof on the estate's loss of life claim fails and that summary judgment is warranted on the death claim of the estate (*Id.*, at 11). Ms. Hayes responds that she has adequate proof of proximate cause to survive summary judgment (Dkt. No. 17, at 2-4). Specifically, Ms. Hayes identifies the death certificate as competent proof on proximate cause of the wrongful death claim to withstand the United States' motion for summary judgment and reserve the question of causation for trial (*Id.*, at 3-4). The United States replies that the death certificate alone does not create an issue of disputed fact and that Ms. Hayes' failure to present a qualified medical expert willing to testify

about this document or Mr. Bealer's cause of death dooms her claim under Arkansas law (Dkt. No. 18, at 2-3).

The Court finds that the standard of care required to protect Mr. Bealer from injury given his physical condition at the time of his fall is not a matter of common knowledge and must be established through expert testimony from a healthcare provider. Therefore, Arkansas law requires Ms. Hayes to present expert testimony to prove her claim of medical negligence as it relates to the medical care Mr. Bealer received. The Court finds this expert testimony necessary to comport with Arkansas law despite Ms. Hayes' submission of Mr. Bealer's certificate of death. *See Howard v. United States*, No. 4:16-cv-00687, 2019 WL 1442199, at *17, *21 (E.D. Ark. Mar. 31, 2019) (requiring expert testimony to prove plaintiff's claim of medical negligence as it related to medical care decedent received despite plaintiff's submission of decedent's death certificate).

As the United States points out, the death certificate itself is ambiguous as to cause of death, with the "immediate cause" and "final disease or condition resulting in death" listed as "Head and Neck Cancer" on line 20.a. of the form (Dkt. No. 16-1). Then, presumably in response to the direction to "list condition, if any, leading to the cause listed" as the immediate cause and in response to the direction to enter the underlying cause, defined as the disease or injury that initiated the events resulting in death, last in a list, the individual completing the form listed these causes in the following order: on 20.b. "Sec. of the Epiglottis"; on 20.c. "S/P total laryngectomy"; and on line 20.d. "Right Humeral Fracture." (*Id.*). When asked to identify the manner of death on line 22 of the form, the individual completing the form marked the "natural" box instead of the "accident" box (*Id.*). Ms. Hayes has come forward with no sponsoring witness or expert witness to testify as to the meaning of the death certificate or what was intended by completing the form in this way. Ms. Harris, Ms. Hayes' sole expert, has specifically testified that she is not qualified

16

to render a medical opinion on the cause of Mr. Bealer's death (Dkt. No. 12, at 10), and Ms. Hayes does not contest this point through argument or record evidence. Furthermore, under Arkansas law, registered nurses are unqualified to offer expert opinions of the proximate cause of death. *See Girlinghouse v. Capella Healthcare*, No. 6:15-cv-6008, 2016 WL 5539610, at *7 (W.D. Ark. Sept. 28, 2016) (citing *Neal v. Sparks Reg'l Med. Ctr.*, 422 S.W.3d 116, 122 (Ark. 2012)).

In fact, the only offered expert medical testimony in the record is Dr. Khan's conclusion that Mr. Bealer died of the head and neck cancer rather than his fall on November 21, 2015 (Dkt. No. 13-1, ¶ 58). Ms. Hayes fails to meet proof with proof at the summary judgment stage on the record evidence before the Court. "[M]ere possibilities" are insufficient to raise a triable issue of fact. *Day v. United States*, 865 F.3d 1082, 1087 (8th Cir. 2017) (citing *Flentje v. First Nat'l Bank of Wynne*, 11 S.W.3d 531, 538 (Ark. 2000)). Accordingly, Ms. Hayes' loss of life claim fails, and the Court grants summary judgment in favor of the United States on the death claim of the estate.

### D.  Wrongful Death Action—Statutory Beneficiaries' Claim

The Arkansas Wrongful Death Statute states, in pertinent part, that:

> Whenever the death of a person or an unborn child as defined in § 5-1-102 is caused by a wrongful act, neglect, or default and the act, neglect, or default would have entitled the party injured to maintain an action and recover damages in respect thereof if death had not ensued, then and in every such case, the person or company or corporation that would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person or the unborn child as defined in § 5-1-102 injured, and although the death may have been caused under such circumstances as amount in law to a felony.

Ark. Code Ann. § 16-62-102(a)(1). In addition to the claim brought on behalf of the estate, the wrongful death statute allows certain enumerated statutory beneficiaries to recover damages for their own individual personal loss. *See* Ark. Code Ann. §§ 16-62-102(d), (f). This statute allows damages in the form of pecuniary damages, including a spouse's loss of companionship and services and the mental anguish for the loss of a loved one. *See* Ark. Code Ann. § 16-602-

102(f)(1)-(2). The Supreme Court of Arkansas has ruled that the wrongful death statute, as a statutory creation, must be construed "strictly." *Estate of Hull v. Union Pac. R.R. Co.*, 141 S.W.3d 356, 358 (Ark. 2004) (citing *Babb v. Matlock*, 9 S.W.3d 508 (Ark. 2000); *Simmons First Nat'l Bank v. Abbott*, 705 S.W.2d 3 (Ark. 1986); *McGinty v. Ballentine Produce, Inc.*, 408 S.W.2d 891 (Ark. 1966)). Critically, under Arkansas law, wrongful death actions "are derivative of the underlying tort committed against the decedent." *Day*, 865 F.3d at 1088 (citing *Hull*, 141 S.W.3d at 359 & n.3). The derivative nature of wrongful death actions under Arkansas law means that "where the underlying tort action is no longer preserved, the wrongful death action is barred as well." *Brown v. Pine Bluff Nursing Home*, 199 S.W.3d 45, 48 (Ark. 2004) (citations omitted).

Because the Court grants summary judgment for the United States on Ms. Hayes' underlying loss of life tort action, Ms. Hayes' wrongful death claims also fail. *See Day*, 865 F.3d at 1088 ("Because the medical-malpractice claims fail in the present case, so too must the wrongful-death claims." (citing *Brown*, 199 S.W.3d at 48; *Hull*, 141 S.W.3d at 359-60)). Accordingly, the Court grants summary judgment for the United States on Ms. Hayes' wrongful death claims.

### IV. Conclusion

For the foregoing reasons, the Court grants the United States' motion for summary judgment (Dkt. No. 11). The Court denies Ms. Hayes the relief she seeks and dismisses with prejudice her claims (Dkt. No. 1). Judgment will be entered accordingly.

It is so ordered, this 31st day of January, 2020.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge